Filed 6/11/13  P. v. Goins CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PIERRE JOENELL GOINS,<br><br>        Defendant and Defendant. | A134149<br><br>(Alameda County<br>Super. Ct. No. C163346) |

A jury convicted defendant Pierre Joenell Goins of second degree murder (Pen. Code,[1] § 187), and being a felon in possession of a firearm (§ 12021, subd. (a)(1), repealed by Stats.2010, ch. 711, § 4, now § 29800, subd. (a)(1) ).  The jury also found true the allegations that defendant personally and intentionally discharged a firearm, causing great bodily injury and death.  (§§ 12022.7, subd. (a); 12022.53, subds. (b), (c) & (d); 12022.5, subd. (a).)  The trial court sentenced defendant to 43 years to life in prison.  On appeal, defendant contends his conviction must be reversed because the trial court erroneously refused to allow character evidence regarding the victim and deprived him of his constitutional right to retain counsel of his choice.  He further claims that reversal is required because his videotaped confessions—wherein he admitted to shooting the victim at close range, multiple times in the back—were not voluntary.  We affirm.

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

## I. FACTS

### A. *Prosecution Case*

#### 1. *The Murder*

In July of 2009, Latasha Odom lived in an apartment at 2355 Humboldt Avenue in Oakland with her two children and her daughter's father, Julius Batiste. At the time, Odom's cousin Bianca Hernandez and Hernandez's young son temporarily lived there as well. Defendant was a friend of Hernandez's and Odom had met him once.

On July 7, 2009, Odom was decorating the apartment with streamers and balloons in preparation for her combined birthday party with her son the next day. Around midnight, Hernandez called to wish Odom a happy birthday and said she and defendant were coming over. Hernandez introduced defendant to Batiste. Everyone was drinking and playing dominos; there were no problems. A neighbor named "Jim" came to the door and asked if they had a "Swisher," which was used to smoke marijuana. Jim recognized defendant from the neighborhood. As no one had a Swisher, Jim, defendant, and Batiste went to a nearby convenience store to buy one. Upon returning to the apartment, they realized that they bought the wrong flavor; defendant went back to the store for a different one.

Once back from the store, defendant, Odom, Hernandez, and Batiste continued to drink and play dominos and cards. Odom testified that, at some point, Batiste got up from the table where the four had been sitting, and then defendant got up and his chair bumped Batiste. Defendant then shot Batiste in the back four times and ran out the door. Hernandez ran after Defendant questioning what he had done. Odom called 9-1-1 and the tape was played for the jury. Batiste died at the scene.

When Odom was initially interviewed by the police, she identified herself as "Tammy Williams." At the preliminary hearing, Odom denied drinking alcohol and smoking marijuana on the night of the murder, but at trial she admitted she had lied. She, however, denied being drunk at the time of the murder. Odom further admitted that she had been in trouble with the law in the past and had suffered three prior convictions: assault in 2008, drug possession in 2008, and theft in 2003.

2

Bianca Hernandez testified that the night before the murder, she had spent the night with defendant in a motel. Hernandez had known defendant for less than a month, and had purchased marijuana from him. At midnight, Hernandez called Odom and wished her a happy birthday and then she and defendant went to the apartment on Humboldt. Everything seemed to be fine. They were playing dominos, drinking vodka, and defendant was sharing his marijuana. Hernandez recalled Batiste sitting up against the wall listening to music and "rapping." Batiste then got up and said he was getting something to eat. However, Batiste never made it to the kitchen because defendant fired multiple shots at him, and ran out the front door. Hernandez subsequently gave a statement to the police, and to this day she wants to know why defendant shot Batiste.

Sitha Kung lived across the street at 2363 Humboldt Avenue. On July 7, 2009, he went to bed around 11 p.m. and was awakened by gunshots, which he initially thought were firecrackers. He then heard a woman's voice say, " 'No, no.' " and then say, " 'Why did you do this for?' " The police arrived soon thereafter.

2.      *Police Investigation*

a.      Identification and Arrest

Oakland Police Department technician, Cheryl Cooper reported to the crime scene. She took photographs of the scene, including one of a slug on the floor, but a homicide officer told her to stop until a warrant was obtained, and a search could be conducted. When she returned to the scene approximately four and half hours later, the slug was no longer there. She did find a cup and two glasses on the table, along with four bottles of vodka.

Oakland Police Homicide Sergeant Caesar Basa also responded to the crime scene. A search warrant issued for the location, and no guns were located. Basa interviewed Odom and Hernandez. Odom identified defendant as the suspect in the homicide and she also picked him out of a photographic lineup.

On July 8, 2009, at 11:30 p.m., Oakland Police Officer Daniel Gil was dispatched to 8127 Mariners Drive, apartment 208, in Stockton. Stockton Police had conducted surveillance on the apartment and defendant was subsequently taken into custody at that

3

location.  Two firearms were also taken into evidence.  Defendant's girlfriend, Elizabeth Amber Cruz, directed the officers to a plastic bag containing a purse with two revolvers inside.  Four rounds were removed from one of the guns.  Defendant was transported to the Oakland Police Department.

> b.    Defendant's Two Videotaped Confessions

On July 9, 2009, defendant was interviewed at the Oakland Police Department. Defendant was read his *Miranda* rights and he waived those rights.  The videotaped interview was played for the jury.  Defendant initially stated that he had not been on Humboldt the night before and spent the night at his girlfriend's house in Oakland before heading to a friend's apartment in Stockton around 1 or 2 p.m.  Defendant subsequently admitted he was at Odom's and Batiste's home with Bianca Hernandez and that it was Odom's birthday.  Although things started out on a friendly note, defendant said that Batiste "started trippin" and "mugging" him for some unknown reason.  Defendant said that earlier in the night, when they were "chillin," Batiste told him that once before he had shot at Hernandez's "baby daddy."  Defendant said that Batiste referred to the prior incident as making the other guy "do the runnin man."

Defendant believed that Batiste and Hernandez may have had "something going" on between them.

Although he "didn't see no pistol," defendant believed he saw Batiste's gun sort of "poking" out.  Defendant explained that he saw a "[l]ittle bit," explaining that "people be trying to hide that shit" . . .[¶]  "You know, how you can see it bulging out." Defendant said that Batiste began dancing around, playing with his belt, and said that he was going to make defendant "do the runnin man right now in a minute."  Defendant understood this as Batiste's "code" for "shooting at somebody."  Defendant thought that when Batiste turned around he was going to be killed and "did what [he] had to do." Defendant believed Batiste was reaching for a gun; defendant got his gun first and fired three shots.

Following his interview with Oakland Police, defendant also spoke with a representative of the district attorney's office.  District Attorney Inspector Patrick

4

Johnson testified that when a homicide occurs and a suspect is taken into custody by the police, the district attorney's office will also interview the suspect. On July 9, 2009, Johnson, along with assistant district attorney, Kevin Dunleavy, took a statement from defendant at the Oakland Police Department. Defendant waived his *Miranda* rights and agreed to answer their questions. The videotaped statement was played for the jury.

Defendant admitted that it was the first time he had met Batiste. They were drinking and playing cards. Defendant asked to use the bathroom and Batiste said, " 'No.' " Defendant thought he saw a "little piece" of a black gun on Batiste. Batiste mentioned "firing shots" at the "running man," referring to Bianca's ex-boyfriend. Batiste then started to pull his gun on defendant and then defendant shot him first. Defendant admitted to shooting the victim at close range, explaining that he "didn't wanna miss."

### c.  Firearms Evidence

Criminalist Todd Weller of the Oakland Police Department, testified as an expert in firearms, including bullets and slugs. Weller explained that in determining whether a certain gun fired a bullet, he conducts a microscopic examination of scrape marks or striations that are left on the bullet as a result of the bullet traveling through a barrel of a gun. Comparisons are then made by firing test bullets from the gun. In this case, Weller examined three bullets and four cartridges and compared them with the two revolvers in evidence. Based on the test-firing and microscopic examination of the bullets, Weller opined that one of the guns had fired all three rounds.

### d.  Autopsy

Dr. David Levin, a forensic pathologist for Alameda County, testified as an expert. On July 9, 2009, he performed the autopsy on Batiste. There were four shots in the victim's back. Based on the high presence of soot, it appeared that the fourth shot was fired from one foot away or less. Bullet two passed through a rib, through the aorta, then through the airway adjacent to the trachea and lodged in the trachea. Bullet three was in the abdominal cavity. The cause of death was multiple gunshot wounds.

**B.**      *Defense Case*

The defense presented no testimonial evidence, but submitted documentary evidence regarding defendant's medical records.

## II. DISCUSSION

**A.**      *Character Evidence of the Victim*

Defendant contends the trial court abused its discretion and violated his right to a fair trial by denying his in limine motion to present evidence that the victim had committed violent acts in the past and acted in conformity with his character for violence on the night in question.  Defendant maintains this evidence was central to his claim of self-defense because it would have shown his state of mind and would have corroborated his statements to police.

*1.      Background*

The prosecution filed a motion in limine pursuant to Evidence Code sections 1101, 1103, and 352, seeking to exclude any prior bad acts or crimes committed by Batiste. The defense, in turn, filed a motion seeking to admit Batiste's four prior acts of violence under Evidence Code section 1103, subdivision (a)(1).

At the October 4, 2011 hearing on the motions, the trial court stated that it had read defendant's statements to the police and concluded there was no evidence of any threats by Batiste.  The court understood that defendant told police that he believed he saw "parts of a gun or something" and then he shot Batiste before Batiste could shoot him.  The court then summarized the prior acts of violence as follows: 1) On November 7, 2005, Batiste and a co-defendant, robbed a victim at gunpoint.  It was reported that it was the co-defendant who displayed the gun; 2) On or about May 26, 2006, Odom was reportedly struck by Batiste and did not want to press charges.  At the time of the incident they were boyfriend and girlfriend and had a baby together; 3) On or about October 7, 2006, Tracy police responded to a report that Odom had a deep laceration on her right hand.  Witnesses said that they saw fighting and punching and that Batiste then cut Odom with an unknown object.  Odom did not care whether the officer

6

wrote a report; and 4) On April 7, 2006, Odom was hostile, drunk, and belligerent, and said that Batiste pushed her.

Defense counsel argued that the evidence should be allowed as defendant claimed self-defense and the evidence demonstrated Batiste had a "violent nature." Defense counsel further argued that based on defendant's statements to police, Batiste threatened to shoot defendant and defendant shot first in order to save his own life. When the court asked defense counsel to point out the actual threats by Batiste in the record, counsel responded that defendant told police that he needed to go to the bathroom at one point but Batiste would not let him. Defense counsel also said defendant told police that Batiste gave him a hostile look. Defense counsel further noted that defendant told police that when Batiste turned around, defendant believed he was getting ready to pull a gun. Defense counsel argued that defendant was threatened by Batiste and the evidence demonstrated Batiste's violent character.

In response, the prosecutor argued that none of the conduct that defendant said occurred in the Batiste's home on the night of the murder constituted violent conduct. The prosecutor further argued that, on the night in question, defendant had just met Batiste for the first time and, as such, defendant did not know anything about Batiste's prior incidents of violence. Moreover, the prosecutor maintained that "[t]here's absolutely no evidence that . . . Batiste had a gun on this night or any other time in [his] life . . . [Defendant] himself . . . states 'I didn't see no pistol.' " Rather, defendant proceeds to say, " 'You know, people cover up their guns when they have guns . . . I thought I saw a bulge.' "

The trial court issued a tentative ruling that the challenged evidence would not be admissible. There was no further discussion of the proposed evidence at trial.

2.      *Applicable Law*

"We review a trial court's exclusion of evidence for abuse of discretion . . . ." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 827.) " '[W]here . . . a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal *except* on a showing that the court exercised

7

its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Id.* at p. 828.)

Evidence Code section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character." (Evid. Code, § 1103, subd. (a)(1).) Thus, when self-defense is raised in a homicide case, evidence of the aggressive and violent character of the victim is admissible to show the victim was the aggressor. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1069.) The violent nature of a murder victim is irrelevant, however, unless there is "*some evidentiary support* for a self-defense-type theory that the defendant perceived the murder victim as presenting an immediate threat." (*People v. Hoyos* (2007) 41 Cal.4th 872, 912-913, italics added.)

Moreover, "the trial court may exclude otherwise admissible evidence pursuant to Evidence Code section 352 if admitting the evidence would have confused the issues at trial, unduly consumed time, or been more prejudicial than probative. [Citations.] The trial court must always perform its gatekeeping function pursuant to Evidence Code section 350 to exclude evidence that is irrelevant." (*People v. Gutierrez, supra,* 45 Cal.4th at pp. 827–828.)

*3.     Analysis*

Although the record shows that defense counsel failed to seek a final ruling on the admissibility of evidence concerning Batiste's propensity for violence, defendant contends that any further attempts by trial counsel to admit such evidence would have been futile after the court appeared to indicate that it believed such evidence to be inadmissible. Even assuming defendant's argument to be true, the trial court did not abuse its discretion in excluding the challenged evidence.

8

Here, there was no evidence that defendant was in any imminent danger from Batiste. To the contrary, everyone was seemingly having a good time, drinking, and playing dominos and cards. Defendant was a social guest at Batiste's home and there is no indication that he was unable to leave if he had wanted to do so. More importantly, a gun was neither found on Batiste's body nor otherwise located at the scene. Defendant's statements to the police about whether Batiste had a gun were equivocal at best and at the most only suggest that he thought Batiste might have had a gun. On this basis, the trial court properly exercised its discretion. (*People v. Hoyos, supra,* 41 Cal.4th 872.)

In *People v. Hoyos, supra,* 41 Cal.4th 872, our Supreme Court addressed a similar situation. There, the trial court observed that in order for a "victim's propensity for violence to be relevant, there must be some evidentiary support for a self-defense-type theory that the defendant perceived the . . . victim as presenting an immediate threat." (*Id.* at pp. 912–913.) In endorsing this statement, the Supreme Court further explained that "even if the murder victim were the most violent person in the world, that fact would not be relevant if the evidence made it clear that the victim was . . . shot in the back of the head." (*Id.* at p. 913.) In *Hoyos*, the evidence showed that the victim had been beaten while holding a toddler, and "finished off with a bullet to the back of her head." (*Ibid.*) The defendant's claim that the victim posed a threat was based on a third party's statement that victim "might have been going for a gun." (*Ibid.*) The Supreme Court rejected this claim, finding defendant presented nothing more than "sheer speculation" regarding the victim's conduct at the time of the murder. (*Ibid,* fn. omitted.)

The court concluded the trial court acted within its discretion in denying admission of the propensity evidence where the facts adduced at trial failed to show the victim presented any threat to the defendant whatsoever. (*People v. Hoyos, supra*, 41 Cal.4th at p. 913.)

Similarly, here, there was no evidence whatsoever that Batiste could have presented a threat to defendant. The evidence regarding the robbery in 2005 and the domestic violence incidents in 2006 had marginal probative value and did nothing to further defendant's self-defense claim. Moreover, Batiste's prior acts of violence were

not relevant to show defendant's state of mind at the time he killed Batiste unless defendant knew of Batiste's conduct. (*People v. Cash* (2002) 28 Cal.4th 703, 726 [victim's customary debt collection practices not relevant to show defendant's state of mind at the time he killed victim unless defendant knew of those practices].) Here, there was no evidence that defendant knew of Batiste's violent acts towards Odom or of his participation in a robbery. Given this record, the trial court acted well within its discretion in excluding the evidence pertaining to Batiste's alleged propensity for violence.

Finally, to the extent defendant claims that the exclusion of evidence of Batiste's prior violent acts interfered with his constitutional right to present a defense, he never made this claim at trial and, thus, he has forfeited the issue on appeal. (See *People v. Tafoya* (2007) 42 Ca1.4th 147, 166; *People v. Rudd* (1998) 63 Cal.App.4th 620, 628-629 [generally a constitutional claim must be raised in the trial court to preserve the issue for appeal].) Even assuming defendant had preserved this constitutional claim, it would be meritless, because he has failed to show that the exclusion of the evidence made his trial so unfair as to deprive him of due process.

"As a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense.' [Citations.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103.) "Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*Id.* at p. 1103.) A defendant has no constitutionally protected right to introduce evidence that is irrelevant or only remotely relevant. (*People v. Hall* (1986) 41 Cal.3d 826, 834-835.) Further, the United States Supreme Court has recognized, "we have never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." (*Crane v. Kentucky* (1986) 476 U.S.683, 690; accord *People v. Yeoman* (2003) 31 Cal.4th 93, 141-142.)

10

Here, the trial court's ruling did not prevent defendant from presenting evidence from which the jury might have concluded defendant's killing of Batiste was in self-defense. Without again detailing the evidence, the jury heard defendant's statements to police and to the district attorney that although the evening of murder began in a friendly manner, as the night wore on, defendant felt uncomfortable around Batiste due to the fact that Batiste started "mugging" him and would not let him go to the bathroom. The jury also heard defendant say that Batiste was dancing around with a gun in his waistband and talking about making defendant "do the running man." In closing argument, defense counsel emphasized that defendant grew increasingly anxious about Batiste's behavior, and characterized defendant's conduct as being in self-defense. The jury also was instructed with various instructions regarding self-defense. (See, e.g., CALJIC No. 5.12 [justifiable homicide in self-defense]; CALJIC No. 5.13 [justifiable homicide—lawful defense of self]; CALJIC No. 5.15 [burden of proof on prosecution that homicide was not justifiable]; CALJIC No. 5.17 [actual but unreasonable belief in necessity to defend—manslaughter]; CALJIC No. 5.50 [self-defense—assailed person need not retreat]; CALJIC No. 5.51 [self-defense—actual danger not necessary]; CALJIC No. 5.52 [self-defense—when danger ceases]; CALJIC No. 5.53 [self-defense not an excuse after adversary disabled]; CALJIC No. 5.55 [plea of self—defense may not be contrived].) In these circumstances, we cannot conclude that the trial court's ruling prevented defendant from presenting his claim of self-defense. (*People v. Cash, supra,* 28 Cal.4th at pp. 727-728.)

**B.     Right to Counsel**

Defendant contends he was denied his constitutional right to counsel of his choice when the trial court refused to grant a continuance so that his retained counsel could prepare for trial, thereby, effectively denying his request to substitute in retained counsel.

*1.     Background*

Defendant's preliminary hearing was held on March 30, 2010, and he was arraigned on April 15, 2010. Defendant was represented by appointed counsel and a speedy trial was waived.

The case was called for trial on October 3, 2011.  On October 5, the case was set for various pretrial motions, including a *Miranda* issue, and jury selection was to commence the next day.  Prior to the hearing on the motions, defendant personally addressed the court and stated he "would like to hire a private attorney."  When the court asked whether defendant had "just decided" this, defendant replied, "I've been deciding, but I need some more time."  The court advised defendant that he was there for trial and the private attorney was either there or was not.  In response, defendant said "Conflict of interest.  It's not working."  The court asked defendant when his attorney could get there.  Defendant then asked about how much time he might get and the court reiterated he was there for trial and he did not get any more time.  The court told defendant that unless the new counsel was ready to go right then, the court was hearing defendant's *Miranda* issue. The court advised defendant he should have done this a "long time ago" and proceeded with the *Miranda* hearing.

Later that day, sometime after noon, an attorney named Mr. Kelvin appeared in court and stated he had been contacted two days earlier about substituting in as private counsel for defendant.  Mr. Kelvin indicated that he "would not be requesting to substitute [without] at least two or three weeks to prepare . . . ."  The court denied the request for a continuance as untimely and stated that it would "disrupt the criminal proceedings."

   2.   *Applicable Law*

   "The right to the effective assistance of counsel 'encompasses the right to retain counsel of one's own choosing.  [Citations.]'  [Citation.]  Underlying this right is the premise that 'chosen representation is the preferred representation.  Defendant's confidence in his lawyer is vital to his defense.  His right to decide for himself who best can conduct the case must be respected wherever feasible.'  [Citation.]"  (*People v. Courts* (1985) 37 Cal.3d 784, 789.)  The erroneous deprivation of a defendant's counsel of his choice is a structural error requiring reversal, and is not subject to harmless error analysis.  (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149-150.)

   "Generally the trial court has discretion whether to grant a continuance to permit a defendant to be represented by retained counsel.  [Citation.]"  (*People v. Jeffers* (1987)

12

188 Cal.App.3d 840, 850.) "A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.' [Citation.]" (*People v. Courts, supra,* 37 Cal.3d at pp. 790-791.) Trial courts should accommodate requests for continuances to obtain retained counsel " 'to the fullest extent consistent with effective judicial administration.' [Citation.]" (*Id.* at p. 791.) In determining whether denial of a continuance is so arbitrary as to violate due process, courts look to the circumstances of each particular case, particularly the reasons presented to the trial court. (*Ibid.*)

> 3. *Analysis*

The record in this case supports the trial court's determination that defendant's request was unjustifiably dilatory. There is nothing in the record to suggest defendant had engaged in a good faith, diligent effort to hire retained counsel in the time leading up to trial. First, appointed counsel had been in the case for over two years. In all that time, defendant never filed a *Marsden* motion or otherwise moved to substitute in retained counsel. Second, defendant never presented the trial court with any reasons for waiting until the day before jury selection to request substitution of counsel, such as being financially unable to retain counsel earlier. An unexplained delay in retaining counsel does not establish good cause for continuance. (*People v. Courts, supra,* 37 Cal.3d at pp. 790-791.) Third, when requesting the continuance, defendant neither indicated that a private lawyer had been contacted to represent him nor the amount of time he needed to find one. Rather, defendant equivocally stated, "I've been deciding, but I need some more time." When asked by the court when retained counsel could be there, defendant replied, "How long do you get?" Fourth, nothing in the record suggests that Mr. Kelvin would have agreed to be defendant's counsel. When Mr. Kelvin appeared later that day, he admitted he had been contacted two days before and he needed a chance to "review the file and familiarize [himself] with the case."

Under these circumstances, the trial court properly found defendant unjustifiably delayed his request to substitute retained counsel until the eve of trial, after both parties had answered ready, witnesses had been subpoenaed, and two jury panels had been called

for the next day.  (See *People v. Blake* (1980) 105 Cal.App.3d 619, 623-624 ["[A] defendant who desires to retain his own counsel is required to act with diligence and may not demand a continuance if he is unjustifiably dilatory or if he arbitrarily desires to substitute counsel at the time of the trial"].)  The trial court was properly concerned about the untimeliness of the request and the inability of retained counsel to immediately step in without delaying the trial.  We agree with the trial court's finding that continuing the trial under the circumstances would have adversely affected the orderly administration of justice.  (See *People v. Johnson* (1970) 5 Cal.App.3d 851, 859.)  There was no violation of defendant's constitutional right to counsel of his choice.

The instant case is readily distinguishable from *People v. Courts, supra,* 37 Cal.3d 784, where our Supreme Court found an abuse of discretion in denying the defendant's request for a continuance one week before trial so that he could retain counsel to represent him against a murder charge.  (*People v. Courts, supra,* 37 Cal.3d at p. 791.)  There, the record established the defendant "engaged in a good faith, diligent effort to obtain the substitution of counsel *before* the scheduled trial date."  (*Ibid.*)  The defendant had contacted counsel two months before trial and spent the following weeks trying to raise the necessary funds for a retainer.  (*Ibid.*)  The defendant's attempt to conclude arrangements with counsel was delayed due to counsel's vacation.  (*Id.* at p. 792.)  Additionally, there was no showing a continuance would have significantly inconvenienced the court or the parties.  (*Id.* at p. 794.)  In reversing the denial of the continuance, the Supreme Court contrasted the defendant's continuance request, made a week before trial, with cases in which defendants had made "eve-of-trial, day-of-trial, and second-day-of-trial requests" and noted that various appellate courts had "found the lateness of the continuance request to be a significant factor which justified a denial where there were no compelling circumstances to the contrary."  (*Id.* at p. 792, fn. 4.)

Here, unlike the defendant in *Courts,* defendant made no showing that he had an attorney who was ready and willing to take his case.  Also, he waited until the last moment to indicate to the court his dissatisfaction with his counsel and, even then, he had not made any actual arrangements to secure new representation.  Having failed to make a

14

timely request, defendant cannot demand a continuance simply because there was no additional demonstration of prejudice to the court or prosecution other than the significant disruption of the orderly processes of justice necessarily attendant to a continuance granted on the day set for trial. (See *People v. Ortiz* (1990) 51 Cal.3d 975, 983; *People v. Turner* (1992) 7 Cal.App.4th 913, 918-919.) "Due process is not denied every defendant who is refused the right to defend himself by means of his chosen retained counsel; other factors, including the speedy disposition of criminal charges, demand recognition, particularly where defendant is inexcusably dilatory in securing legal representation." (*People v. Brady* (1969) 275 Cal.App.2d 984, 993.) Defendant has the burden to show an abuse of judicial discretion in the denial of his request for continuance to secure new counsel. (*People v. Blake, supra,* 105 Cal.App.3d at p. 624.) We cannot say the trial court abused its discretion in denying defendant's motion.

## C.    *Voluntariness of Confession*

Defendant next claims that his initial confession was involuntary and should have been excluded. He further claims his second confession should be excluded as being tainted by the first coerced confession.

### 1.    *Background*

#### a.    Police Interview

Sergeant Basa testified that he was assigned to investigate the Batiste homicide that occurred on July 8, 2009. Defendant was arrested in Stockton around 11:30 p.m. that same day. Pursuant to Sergeant Basa's log, defendant was placed in an interview room at 1:40 a.m. on July 9, 2009. At 6:10 a.m., Basa met with defendant and he appeared awake and lucid. He did not appear under the influence of drugs or alcohol. The interview began at approximately 6:20 a.m. and Sergeant Parkinson was also in the room. Parkinson read defendant his *Miranda* rights verbatim, straight from a form. Defendant waived his *Miranda* rights and signed the waiver form. The interview was recorded and lasted

15

approximately two to two and half hours.[2] Sergeant Basa testified that defendant was given food and water. Basa's log did not reflect that bathroom breaks were requested nor did it reflect that any were denied. Defendant indicated that he might have thrown up at some point earlier. Defendant had pulled the neck of his shirt up to his forehead. Basa apologized for it being cold, but explained that since it was middle of summer, the building's air conditioner was on. At one point, defendant complained of a headache in the back of his head and related it to not taking blood pressure pills. He said he did not have the pills with him and also complained of having kidney problems.

According to Basa's log, defendant was given water at 1:40, 1:50, 4:24, and 6:03 a.m., before the interview began. Throughout the interview, defendant was also given water at various times. During the first forty minutes of the interview, defendant sat with his t-shirt pulled up over his face, and his arms tucked inside his shirt. When asked why he was sitting that way, defendant indicated that he was just cold and that his nerves were bad. The officers explained that they were talking about "some serious stuff" and that they needed to see his face. Despite the officers attempt to talk of the "serious" event that occurred, defendant continued to sit with his face covered and his arms inside his shirt. When the officers told defendant it was hard to understand him when he had his head in his shirt, defendant replied that he was "[j]ust cold, that all man." When Sergeant Parkinson said "You ain't cold, Pierre, not that cold," defendant did not ask for a blanket or ask for anything to warm himself, but said "And plus I ain't got no sleep. I woke . . . up by [the] SWAT team or something . . . ." Parkinson told defendant that he did not seem like a bad guy, but that they could not even talk to him with his "face all covered." Defendant replied that the officers could talk to him, explaining "it's just my nerves, man. I do this even when I am just sitting in the house." When asked if he was nervous, defendant replied "hell no," explaining a prior gun shot left him with a "bullet pressuring" on his nerves.

---

[2] According to the time stamping on the recording, the interview began at 6:18 a.m. and ended at 8:47 a.m. This court has watched the recording in its entirety and followed along with the transcript provided in the supplemental clerk's transcript on appeal.

16

After watching defendant's behavior in answering Sergeant Parkinson's questions, Sergeant Basa said: "Do me a favor, put your hands through the shirt, sit up in your seat like a man, all right? Quit bullshitting man. We've done it long enough. Pierre, we've done it long enough man." Basa then told defendant that he could try all he wanted to distance himself from the situation, but it was not going any where. At times during the interview, defendant also closed his eyes, claiming his was sleepy. At one point, Sergeant Basa told defendant that he could close his eyes to the situation, but that it was going no where, and that defendant needed to open his eyes to the truth. Sergeant Basa told defendant, "I've given you all the respect from the very beginning but I'm not going to sit up in here and take that bullshit from you. Hiding behind your t-shirt, acting like a child."

Sergeant Basa again reiterated the seriousness of the incident and stressed the importance of finding out the truth about what had happened. Defendant in response said, "My mind ain't working right, I'm so sleepy . . . ." Sergeant Basa replied, "Well, then you gotta get it right. You gotta wake up. Everybody here's tired. . . . We've been at this since yesterday when this first happened . . . You're tired, I'm tired, he's tired. . . . "[Y]ou can close your eyes, . . . [¶] [y]ou can push yourself away from the situation right here, man, but it ain't going anywhere, son." Soon after, defendant said, "Give me the water so I can talk." After Sergeant Basa retrieved the water, defendant said "Ain't got no food in my stomach man []." Sergeant Basa told defendant: "Hold on man. We can get past all that, you know we can always get you food but we gotta talk about what happened." Following his confession, the officers brought defendant some food.

b.      Interview with District Attorney

Inspector Johnson of the Alameda County District Attorney's office, responded to the Oakland Police Department with assistant district attorney Dunleavy to interview defendant. The interview lasted from 12:20 p.m. to 12:54 p.m. Defendant was read his *Miranda* rights from a form and he verbally waived them and signed a form indicating that he waived his rights. Defendant agreed to talk to investigators and appeared lucid.

17

Johnson had listened to defendant's recorded statement and already knew that defendant admitted to shooting Batiste.

### c.     Motion to Suppress Confession

Defense counsel moved to suppress defendant's statements on the grounds that they were not voluntary. According to defense counsel, defendant was deprived of water and told that he had to "speak first" and "get water later." Counsel also argued that defendant was not fed until he was "rewarded" with food after giving his confession. Defense counsel further noted that the district attorney's interview was based solely on the first interview and, thereby, tainted by the involuntary confession.

In response, the prosecutor stated that defendant was provided with food between the police interview and the interview with the district attorney's office. The prosecutor also noted that defendant told police he had eaten the day before and the record reflected he was given water numerous times. The trial court denied the motion to suppress.

### 2.     *Applicable Law*

An involuntary confession is inadmissible under the due process clauses of the 14th Amendment to the federal Constitution (*Jackson v. Denno* (1964) 378 U.S. 368, 385-386) as well as article I, sections 7 and 15 of the California Constitution (*People v. Benson* (1990) 52 Cal.3d 754, 778).

"The law governing voluntariness of confessions is settled. 'In reviewing the voluntary character of incriminating statements, " '[t]his court must examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat. [Citations.] With respect to the conflicting testimony, the court must "accept that version of events which is most favorable to the People, to the extent that it is supported by the record." ' [Citations.] "In order to introduce a defendant's statement into evidence, the People must prove by a preponderance of the evidence that the statement was voluntary. [Citation.] . . . When, as here, the interview was tape-recorded, the facts surrounding the giving of the statement are undisputed, and the appellate court may independently review the trial

court's determination of voluntariness." [Citation.]' " (*People v. McWhorter* (2009) 47 Cal.4th 318, 346-347.) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions." (*People v. Maury* (2003) 30 Cal.4th 342, 404.) The ultimate question " 'is whether defendant's choice to confess was not "essentially free" because his will was overborne.' " (*People v. Massie* (1998) 19 Cal.4th 550, 576.) "Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. (*Withrow v. Williams* (1993) 507 U.S. 680, 693-694; *People v. Williams* (1997) 16 Cal.4th 635, 660.)" (*People v. Massie, supra*, 19 Cal.4th at p. 576.) The factors to be considered include the element of police coercion, the length and location of the interrogation, and the defendant's maturity, education, physical condition, and mental health. (*Ibid.*)

  *3. Analysis*

  Having independently reviewed the record and the taped interrogation, (*People v. Massie, supra,* 19 Cal.4th at p. 576; *People v. Wash* (1993) 6 Cal.4th 215, 238), we conclude under the totality of the circumstances, defendant's confession was voluntary.

  True, before the police interrogation began, defendant had been in the interview cell for approximately four hours. But the interview itself was not excessive or prolonged. Throughout the course of the interview, defendant was given water and otherwise treated respectfully. When defendant indicated that he had no food in his stomach, he did not expressly state that he was hungry or request any food. More importantly, Sergeant Basa never told defendant that receiving food was contingent on defendant's decision to give a statement. Indeed, Sergeant Basa told defendant that they could always get him food. As to defendant's claims that he was cold, sick, and tired throughout the interview, the record belies such claims. It is evident from the videotape that defendant was lucid, coherent, and otherwise healthy. At most it appears that defendant was suffering, as he put it, from "a little . . . hangover."

  Defendant never asked for a blanket, to lie down, or for any medication. Defendant also adamantly denied that he was nervous during the interview. Further, defendant professed there was nothing unusual about him sitting with his head inside his

19

shirt. According to defendant, he always sat like that, even while at home. From our independent review of the interrogation, there is no evidence that the police engaged in any coercive tactics and nothing suggests that defendant's will was overborne. (*People v. Maury, supra,* 30 Cal.4th at p. 404; *People v. Massie, supra,* 19 Cal.4th at p. 576.) Accordingly, we conclude that defendant's confession was voluntary.

**D.** *Cumulative Error*

Lastly, defendant contends reversal is required due to the cumulative effect of the errors he suffered at trial. However, where as here, there is no error at all, there is no viable claim of cumulative error. (*People v. Ramirez* (2006) 39 Cal.4th 398, 465.)

### III. DISPOSITION

The judgment is affirmed.

_____
REARDON, J.

We concur:

_____
RUVOLO, P. J.

_____
HUMES, J.